**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Cindy Knuth,

        Plaintiff,

              Civ. No. 06-3515 (RHK/JSM)
              **MEMORANDUM OPINION**
              **AND ORDER**

v.

Metropolitan Life Insurance Company,

        Defendant.

---

William J. Marshall, Babcock, Neilson, Mannella, Klint, P.L.L.P., Anoka, Minnesota, for Plaintiff.

Doreen A. Mohs, Rider Bennett, LLP, Minneapolis, Minnesota, for Defendant.

---

**INTRODUCTION**

In this action, Plaintiff Cindy Knuth has sued the administrator of her employee-disability benefit plan (the "Plan"), Metropolitan Life Insurance Company ("MetLife"), seeking to recover unpaid benefits after MetLife denied her claim for long-term disability ("LTD") benefits. The parties have cross-moved for summary judgment. For the reasons set forth below, the Court will grant MetLife's Motion and deny Knuth's Motion.

**BACKGROUND**

From March 31, 2004, to February 8, 2005, Knuth worked for Home Depot U.S.A., Inc. ("Home Depot") as a sales representative in the paint department. (AR 376; Def. Mem. in Supp. at 2; Pl. Mem. in Supp. at 1.)[1] For several years prior to her employment with Home Depot, Knuth had complained of ongoing pain in her wrists. (AR 171, 196.) Because of this pain, on January 25, 2005, she underwent electrophysiological diagnostic studies ("EMGs") on each of her wrists and was diagnosed with mild carpal tunnel syndrome. (Id. at 196.) At first, she attempted to treat her carpal tunnel syndrome with non-surgical techniques. (Id.) These techniques ultimately failed, however, and she underwent carpal tunnel release surgery for her right and left wrists on February 9, 2005, and March 9, 2005, respectively. (Id. at 157-58, 160.)

**I.      Knuth's STD and LTD Benefits**

Pursuant to her employment, Knuth was eligible to receive short-term disability ("STD") benefits and LTD benefits from MetLife. (Id. at 002-03, 019-30.) The Plan provides that for STD and LTD benefits:

> [t]he Plan Administrator . . . has the full power and authority in its absolute discretion to determine all questions of eligibility for and entitlement to benefits, and to interpret and construe the terms of the plans. Benefits under each plan will be paid only if the Plan Administrator . . . decides in its discretion that the applicant is entitled to them.

(Id. at 123.)

---

[1] The Administrative Record and Plan documents have been Bates stamped AR001-AR380.

Four criteria must be satisfied for an employee to qualify for STD benefits under the Plan: (1) the disability period must be expected to last longer than 14 consecutive days; (2) the employee must be under the care of a qualified doctor; (3) the employee must not be able to perform the duties of her regular job; and (4) MetLife must receive certification and medical documentation of the disability. (Id. at 144.) If these qualifications are met, STD benefits are available 14 days after the onset of the disability and can continue for a maximum of 24 weeks. (Id.)

To qualify for LTD benefits, four similar criteria must be satisfied: (1) the employee must be unable to return to work after the 26-week STD period; (2) the employee must continue to be under the care of a qualified physician; (3) the employee must be unable to engage in any type of work; and (4) MetLife must receive certification and medical documentation of the disability. (Id. at 146.)

To obtain either STD or LTD benefits, an employee must submit a claim and "describe the event, the nature and the extent of the cause for which the claim is made." (Id. at 030.) Proof of the disabling nature of the injury "must be satisfactory to [MetLife]." (Id.)

**II.     Knuth's Ongoing Complaints of Pain**

Following her carpal tunnel release surgeries in 2005, Knuth applied for and received STD benefits from MetLife until these benefits expired on August 8, 2005. (Id. at 167, 374.) During this time, she was examined and treated by several physicians regarding her ongoing complaints of pain in her wrists and arms.

On March 16, 2005, Knuth received the first of her several, post-surgical examinations. At that examination, performed by her surgeon, Dr. Stephen Olmstead, Knuth complained of continuing pain in her wrists. (Id. at 363.) Despite these complaints, Dr. Olmstead observed that Knuth had "full flexion and extension of the wrist and digits" and recommended "light activities with both [wrists] for [one] month." (Id.) He also recommended that she return to work "with limitations" on April 15, 2005, and "without limitations" on May 1, 2005. (Id. at 364.)

Despite her time off from work, Knuth continued to experience pain in her wrists and forearms, and on April 15, 2005, she was examined by her treating physician, Dr. John Erickson. (Id. at 263-64; Pl. Mem. in Supp. at 2.) Dr. Erickson recommended that, because of her pain, she continue to limit the use of her hands. (AR 263-64.) Her pain continued to persist, however, and on April 27, 2005, she returned to Dr. Olmstead for a second examination. During that examination, Dr. Olmstead observed that Knuth had full range of motion of her wrists and digits, normal sweat pattern, and no "wasting" of the thenar muscles or intrinsic atrophy. (Id. at 345.) He also observed thickened, sensitive scars over the area of her incisions, but noted that this was "nothing out of the ordinary." (Id.)

4

However, because of her continuing pain complaints, he recommended that she remain off of work until June 15, 2005. (Id. at 345-46.)

On May 27, 2005, Knuth was re-examined by Dr. Erickson and complained that the continuing pain in her wrists inhibited her ability to sleep. (Id. at 261.) Dr. Erickson observed no deformities in her wrists but noted that her scars appeared tender to the touch. (Id.) He increased Knuth's pain medication and recommended that she keep a previously scheduled appointment with Dr. Olmstead. (Id. at 261-62.)

On June 8, 2005, Dr. Olmstead examined Knuth's wrists for a third time and determined that her continuing pain was of "[u]nclear etiology" and "out of proportion with what would be expected" at the time. (Id. at 334.) To determine the cause of her pain, he ordered repeat EMGs for each of her wrists and recommended that she remain off of work until July 15, 2005. (Id. at 332-33.) On June 21, 2005, the EMGs were performed; the test results were within normal limits and showed improvement over the EMGs performed before her surgeries. (Id. at 207-08, 333.)

There is no indication in the record that Knuth was examined by Dr. Olmstead following her second EMG tests. However, she continued to consult Dr. Erickson regarding her complaints of pain. During an examination on July 15, 2005, Dr. Erickson noted that her most recent EMGs showed improvement in her wrists, but that she appeared "sensitive to gripping or any other activity that uses the hands forcefully." (Id. at 258.) Because of her continued pain, he completed a Family Medical Leave Act ("FMLA") form and a form for the Minnesota Department of Employment and Economic Development, in

5

which he stated that Knuth was unable to perform any type of work until September 1, 2005, because of her pain.  (Id. at 239, 258, 328.)

Knuth's condition did not improve, and on August 25, 2005, she was re-examined by Dr. Erickson for continued complaints of pain in her wrists.  (Id. at 298.)  At that examination, she also complained of depression stemming from unrelated family troubles.  (Id.)  In an effort to determine if her problems were neurological, Dr. Erickson referred her to a neurologist for testing and provided her with a hand-written note stating that she could not return to work until October 1, 2005.  (Id. at 298, 304.)  Following this examination, Knuth did not visit a neurologist.  (Id. at 250.)

On September 29, 2005, Knuth returned to Dr. Erickson and complained of discomfort in her ear canals, lightheadedness, and congestion, as well as continuing pain in her wrists.  (Id. at 293.)  Dr. Erickson suspected that these new symptoms were caused by "low grade acute sinusitis" and provided her with another hand-written note stating that she could not return to work until November 1, 2005.  (Id. at 293, 302.)  Finally, on October 25, 2005, Knuth visited Dr. Erickson with continued complaints of pain and depression.  (Id. at 250.)  During this visit, Dr. Erickson learned that Knuth had not yet consulted with a neurologist despite his previous recommendation that she do so; he again referred her to a neurologist and provided her with another hand-written note stating that she could not return to work until December 1, 2005.  (Id.)

On November 21, 2005, Knuth was examined by Dr. Ingrid Abols, a neurologist with the Minneapolis Clinic of Neurology.  During this examination, Knuth complained of pain

6

in her wrists, neck, lower back, legs, and all of her joints. (Id. at 275.) Dr. Abols performed a series of tests on Knuth's nervous system and observed normal functions, except for a decreased range of motion in her cervical spine. (Id. at 276-77.) Following her examination, Dr. Abols's impression was that Knuth suffered from depression and Chronic Pain Syndrome, a "generalized[,] diffuse pain complaint." (Id. at 277.) Dr. Abols recommended that Knuth undergo further tests of her spine and muscular system, that she visit a psychiatrist, and that she attend a pain-management program. (Id.)

There is no evidence in the record that Knuth visited a psychiatrist or underwent the further testing recommended by Dr. Abols. She did, however, attempt to see a pain specialist for the purpose of participating in a pain-management program, but was put on a waiting list.[2] (Id. at 240.)

### III. Knuth's Application for LTD Benefits

Knuth initially applied for LTD benefits from MetLife[3] on August 13, 2005, claiming that she was disabled because of pain in her hands and wrists. (Id. at 310-21.) On her application, Knuth stated that she had difficulty sleeping because of the pain and that there had been no change in her ability to care for her personal needs. (Id. at 317-19.) She did, however, state that she had a "hard time doing things with [her] hands," that she had to

---

[2] At oral argument, counsel stated that Knuth remains on that waiting list.

[3] Knuth received STD benefits through August 8, 2005, and they are not at issue in this litigation. (AR 167; see also Compl.)

rest when she performed household duties, and that her pain caused difficulties driving. (Id.)

On October 21, 2005, MetLife sent a letter to Dr. Erickson requesting that he provide it with objective medical evidence, including test results indicating specific limitations, supporting his recommendation that Knuth remain off of work beyond the date that her STD benefits expired. (Id. at 173-74.) In response, Dr. Erickson sent MetLife records of his referral of Knuth to the Minneapolis Clinic of Neurology and a hand-written note stating that she was unable to work until December 1, 2005, because of pain in her hands. (Id. at 173-74, 289-90.)

A clinical specialist for MetLife reviewed the medical documentation provided to it from Drs. Olmstead and Erickson and determined that it had been provided no objective evidence supporting Knuth's claim that she was unable to work due to pain in her hands and wrists. (Id. at 174-75, 288.) Accordingly, on November 14, 2005, MetLife denied Knuth's LTD claim. (Id. at 287-88.) In its denial letter, MetLife referred to Dr. Olmstead's examinations in which he found no physical abnormalities with her wrists. (Id.) It also notified her that it had not received objective medical evidence from Dr. Erickson supporting his determination that she was unable to work, despite its request that he provide such evidence. (Id.)

On May 12, 2006, Knuth appealed MetLife's decision and provided MetLife with medical records pertaining to her surgery, as well as a letter from Dr. Abols to Dr. Erickson describing the neurological evaluation that she had performed. (See id. at 219-79.) To evaluate her appeal, MetLife consulted with two independent physicians: Dr.

8

Richard Silver, who is board certified in orthopedic surgery, and Dr. Peter Sugerman, who is board certified in adult psychiatry, who each reviewed all of the medical records in MetLife's possession. After reviewing the records, Dr. Silver opined that Knuth's "subjective nature of pain was not substantiated by objective clinical findings," that she "can work unrestricted," and that "she is fit for a full duty in her normal occupation as an associate sales [representative] at Home Depot in the paint department." (Id. at 196-97.) Dr. Sugerman noted in his review that Dr. Abols's report of Knuth's "[d]epression . . . is characterized as situational, or related to stress" and that "a psychiatric evaluation is not in [MetLife's] file." (Id. at 192.) He opined that MetLife's records provided "no evidence of a severe psychiatric disorder during the timespan covered by [MetLife's] file" and that "data is not presented that would provide evidence of a clinical psychiatric disorder as opposed to an experience of discomfort." (Id.)

On June 20, 2006, MetLife informed Knuth that, after reviewing the medical records provided to it and having consulted with Drs. Silver and Sugerman, it was denying Knuth's appeal. (Id. at 183-86.) On August 2, 2006, Knuth filed the instant action in Minnesota state court, alleging breach of contract. (Compl. ¶ V.) On August 29, 2006, MetLife removed the action to this Court; it now moves for summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Cattrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the non-moving party. See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The non-moving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**ANALYSIS**

**I.      Standard of Review for ERISA Plans**

An ERISA plan participant[4] may bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). When a plan reserves discretionary authority to the plan administrator to determine eligibility for benefits, the Court typically reviews the administrator's decision for an abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989); King v. Hartford Life & Accident Ins. Co., 414 F.3d 994, 998-99 (8th Cir. 2005). Under this standard, the administrator's interpretation of the plan documents must be reasonable and its decision must be supported by substantial evidence. Pralutsky v. Metro. Life Ins. Co., 435 F.3d 833, 838 (8th Cir. 2006) (citing King, 414 F.3d at 999); see also McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 924 (8th Cir. 2004) (court will uphold an administrator's decision if it was "reasonable; i.e., supported by substantial evidence") (citation omitted). A less deferential standard of review applies, however, if a claimant presents evidence demonstrating that "(1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's duty to her." Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998).

---

[4] The Plan is a self-funded, employee welfare benefits plan governed by ERISA. See AR 039-43; 29 U.S.C. § 1001 et. seq.

Here, the Plan provides Metlife with the "full power and authority in its absolute discretion to determine all questions of eligibility for and entitlement to benefits." (AR 123.)  Knuth argues, however, that despite this language, the Court should apply a less deferential standard of review than the abuse of discretion standard.  (Pl. Mem. in Supp. at 21-26.)  The Court rejects this argument.

The Court assumes, *arguendo*, that Knuth has demonstrated that a conflict of interest or procedural irregularity existed in MetLife's decision to deny LTD benefits.  Knuth is unable to show, however, that either of these conditions caused MetLife to breach its duty to her.  For Knuth to show that a conflict of interest or procedural irregularity caused MetLife to breach its duty to her, she must demonstrate that the conflict or irregularity has a connection to the "substantive decision reached." Woo, 144 F.3d at 1161 (citation omitted).  To do so, she must present evidence that raises "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Barnhart v. Unum Life Ins. Co. of Am., 179 F.3d 583 (8th Cir. 1999) (citation omitted).

Knuth has presented no evidence that MetLife's decision was arbitrary or based on a whim.  Instead, she merely argues that MetLife "ignored" her complaints of severe pain when it reviewed her claim.  (Pl. Mem. in Supp. at 26.)  This argument fails on its face,

because the record demonstrates that MetLife did, in fact, consider Knuth's complaints of pain during its review.[5]

Throughout its review, MetLife repeatedly acknowledged Knuth's complaints of pain while it attempted to obtain objective evidence thereof. For example, MetLife's denial letter notes that "Dr. Erickson submitted . . . a note stating that [Knuth is] unable to work, due to hand pain" and that Knuth "repeatedly state[s] [she] continue[s] to suffer." (AR 288.) While it recognized her complaints, Metlife informed Knuth that "[a]n inability to work is not substantiated solely by complaints of pain" and that Dr. Erickson had failed to provide clinical findings supporting his determination that she could not work. (Id.) It then provided Knuth the opportunity to appeal its denial and to submit clinical findings demonstrating that she did, in fact, suffer from debilitating pain. (Id.)

As discussed in more detail below, Knuth did not provide MetLife with the clinical findings that it requested on appeal. Nonetheless, MetLife did not ignore her complaints of pain during its review. Dr. Silver acknowledged that Knuth exhibited a "subjective nature of

---

[5] Knuth also argues that a procedural irregularity caused MetLife to deny her claim because Dr. Silver "ignored . . . accepted standards of care following [carpal tunnel] release surgeries" and determined that she could return to work on a much earlier date than was reasonable. (Pl. Mem. in Supp. at 22, 26.) In support of this contention, Knuth compares Dr. Silver's opinion that recovery from carpal tunnel release surgery can take between seven days and four weeks with several internet medical journals that describe the recovery period as lasting as long as four months. (Pl. Mem. in Supp. at 11-12; AR 197.) However, even if the Court were to accept Knuth's proffered recovery period of four months, she still would have fully recovered by the time she applied for LTD benefits on August 13, 2005, more than five months after her March 9, 2005 surgery. Accordingly, the Court rejects this argument.

pain" but determined that it "was not substantiated by objective clinical findings." (Id. at 195.) He also acknowledged that Drs. Erickson and Abols each diagnosed Knuth with "[n]eck and low back pain with chronic pain syndrome" and that Dr. Abols documented a decreased range of motion of Knuth's cervical spine. (Id.) He noted, however, that despite these diagnoses, "[n]o loss of functionality is documented" in either of Dr. Erickson's or Dr. Abols's reviews. (Id.) Accordingly, while MetLife concluded that Knuth was not disabled, it did not ignore her complaints of pain during its review of her claim. To the contrary, it acknowledged her complaints and provided her with several opportunities to prove that her pain resulted in a disabling condition, which she failed to do.

For these reasons, Knuth has not established that any conflict of interest or procedural irregularity caused a serious breach of MetLife's duty to her when it reviewed her claim for LTD benefits. Accordingly, the Court will review MetLife's denial of her claim under the traditional, abuse of discretion standard.

## II.     MetLife's Denial of Knuth's LTD Claim

### A.     MetLife's Requests for Objective Medical Evidence were Reasonable

MetLife argues that its decision to deny Knuth's LTD claim was reasonable and was not an abuse of discretion because Knuth did not provide objective medical evidence that she was disabled. Knuth counters that MetLife abused its discretion in denying her claim because it was unreasonable for MetLife to require her to provide objective medical evidence of her claimed disability. (Def. Mem. in Opp'n at 6.)

Generally, "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." McGee, 360 F.3d at 924-25. A plan administrator, however, may not require a claimant to provide it with objective evidence of a disability if nothing in the plan documents support such a demand. See House v. Paul Revere Life Ins. Co., 241 F.3d 1045, 1048 (8th Cir. 2001) (plan providing that the administrator "*may* require medical exams or written proof of financial loss" did not entitle the insurer to demand objective medical evidence of a disabling condition) (emphasis added).

In the instant case, the Plan provides that a claimant must submit "proof of the claim" that "describes the event, the nature and the extent of the cause for which the claim is made," and that this proof "must be satisfactory to [MetLife]." (AR 030.) The Plan does not set forth what evidence MetLife will consider "satisfactory" to prove that a claimant is disabled in a particular circumstance. When a benefits plan leaves the discretion to the plan administrator to interpret the degree of "proof" required to establish a claimant's purported disability, however, it is not unreasonable for the plan administrator to require objective medical evidence of the claimed disability, as long as (1) it provides an adequate explanation of the information sought and (2) the evidence requested is not impossible to produce. See Pralutsky, 435 F.3d at 839.

In the instant case, MetLife did not request evidence that would have been impossible for Knuth to produce, and it provided an adequate explanation of the information that it sought. In its October 21, 2005 letter to Dr. Erickson, MetLife requested that he provide the specific restrictions to Knuth's activities based on objective

15

clinical findings.  (AR 173.)  It also requested that he provide test results of Knuth's grip strength, her neurological findings, range of motion measurements, Tinel's sign, and any other diagnostic testing results that he had.  (Id.)  As detailed above, Dr. Erickson's response to MetLife failed to fulfill these requests.

MetLife later requested these same materials from Knuth directly.  In its November 14, 2005 letter denying her claim for LTD benefits, MetLife informed Knuth of the information that it had requested from Dr. Erickson and that he had failed to provide the requested information.  (Id. at 287-88.)  It also informed her of her right to appeal the denial of her claim and provided her with the opportunity to submit additional medical records herself, including the testing results it had requested from Dr. Erickson.  (Id. at 288.)  There is no indication in the record that these requests would have been "impossible" for either Dr. Erickson or Knuth to fulfill.  Furthermore, Knuth does not argue that these requests did not provide an adequate explanation of the information sought, and the Court determines that they did.  Accordingly, MetLife's request for objective medical evidence supporting her claim was reasonable.

### B. Knuth's Failure to Provide Objective Medical Evidence of Her Purported Disability

Despite MetLife's requests for objective medical evidence of Knuth's purported disability, both Dr. Erickson and Knuth failed to provide it. In response to MetLife's request, Dr. Erickson simply sent his referral of Knuth to the Minneapolis Clinic of Neurology and a hand-written note stating that she could not work until December 1, 2005, because of "hand pain." (Id. at 289-90.) Knuth responded to MetLife's request by submitting the medical records of Dr. Abols's consultation indicating that she suffered from Chronic Pain Syndrome and depression. (See id. at 219-79.) As will be discussed below, these records fail to provide any indication that she cannot perform specific functions that would restrict her ability to work.

Knuth argues that she satisfied MetLife's request because MetLife had objective medical evidence of her medical conditions *before* she underwent carpal tunnel release surgery. Specifically, she asserts that her positive EMG results before she underwent carpal tunnel release surgery provide objective medical evidence that she was disabled and therefore entitled to LTD benefits. (Def. Mem. in Opp'n at 11-13.) The EMG results from before her surgery, however, fail to provide objective medical evidence that she was unable to work when she applied for LTD benefits several months later. First, Knuth's surgery was performed to correct the problem that resulted in her positive EMG. Therefore, the Court finds no reason why MetLife should have relied on Knuth's pre-surgery EMGs in determining whether she was disabled. More importantly, however, the EMGs performed

17

on Knuth's wrists after her surgery showed that her surgery was successful and that her wrists had improved from her first set of EMGs. For these reasons, MetLife's decision to rely on Knuth's more recent EMGs, and its failure to acknowledge her previous EMGs as objective evidence of her purported disability, was reasonable.

Knuth also argues that she provided MetLife with objective medical evidence of her disability because Dr. Abols opined that she suffered from Chronic Pain Syndrome and because her physicians continued to treat her for her complaints of pain. (Def. Mem. in Opp'n at 3, 7-9, 12; Pl. Mem. in Supp. at 14, 16-17, 20.) This argument fails for two reasons. First, Dr. Abols provided no test results indicating that Knuth suffered from Chronic Pain Syndrome. Her "impression" that Knuth suffered from Chronic Pain Syndrome – which she described as a "generalized[,] diffuse pain *complaint*" – was based entirely on Knuth's own reports of pain. (AR 277) (emphasis added). In fact, the clinical tests that Dr. Abols performed revealed that, although Knuth had a decreased range of motion in the cervical spine, she had normal neurological functions. Second, Dr. Abols's determination that Knuth suffered from Chronic Pain Syndrome does not satisfy Knuth's burden to provide objective medical evidence that supports the conclusion that she is unable to work because of her condition. As discussed above, Knuth has failed to provide any evidence that her medical conditions restrict her ability to perform the functions of her job. Accordingly, evidence that Dr. Abols believed Knuth suffered from Chronic Pain Syndrome does not establish that she was disabled.

While Knuth did not provide MetLife with objective medical evidence that she was disabled, Metlife was presented with substantial objective medical evidence that she was <u>not</u> disabled. On three separate examinations, Dr. Olmstead evaluated Knuth's wrists and determined they appeared normal. Specifically, he observed "full flexion and extension of the wrists and digits," full range of motion, normal sweat pattern, and no thenar wasting or atrophy. (<u>Id.</u> at 363, 345.) He determined that the cause of her pain was "unclear" and that it was "out of proportion with what would be expected." (<u>Id.</u> at 334.)

In sum, the evidence in the record does not support the conclusion that MetLife acted unreasonably when it denied Knuth's application for LTD benefits. Dr. Olmstead examined Knuth on three separate occasions and each time determined that there were no physical abnormalities in her wrists. An EMG performed on Knuth after her surgery also revealed that her wrists were functioning normally. Dr. Erickson's determination that Knuth could not work because of pain was not supported by clinical findings or tests and Dr. Abols's neurological evaluation revealed normal functions. At no point throughout its review of Knuth's claim was MetLife provided with objective medical evidence that Knuth was unable to work because of a medical condition.

## CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein **IT IS ORDERED** that Plaintiff Cindy Knuth's Motion for Summary Judgment (Doc. No. 11) is **DENIED**, Defendant Metropolitan Life Insurance Company's Motion for Summary Judgment (Doc. No. 6) is **GRANTED** and Plaintiff Cindy Knuth's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: March  13 , 2007                               s/Richard H. Kyle
                                                      RICHARD H. KYLE
                                                      United States District Judge